FILED
IN CLERKS OFFICE

2021 OCT 25 PM 3: 11

U.S. DISTRICT COURT
DISTRICT OF MASS.

# Founders Online

## THE MOROCCAN-AMERICAN TREATY OF PEACE AND FRIENDSHIP, [28 JUNE 1786]

### The Moroccan-American Treaty of Peace and Friendship

God.                                                                    [*28 June 1786*]¹

This is a Treaty of Peace & Friendship, established between Us and the United States of America, which is confirmed & which we have ordered to be written in this Book & sealed with our Royal Seal at our Court of Morocco, on the twenty fifth day of the blessed Month of Shaban in the Year one thousand two Hundred,² trusting in God it will remain Permanent.

.1.

We declare that both Parties have agreed that this Treaty consisting of twenty five Articles, shall be inserted in this Book, & delivered to the Honorable Thomas Barclay, the Agent of the United States now at our Court, with whose Approbation it has been made & who is duly authorized on their Part, to treat with us concerning all the Matters contained therein.—

.2.

If either of the Parties shall be at War with any Nation whatever, the other Party shall not take a Commission from the Enemy, nor fight under their Colors.

.3.

If either of the Parties shall be at War with any Nation whatever, & take a Prize belonging to that Nation, & there shall be found on board Subjects or Effects belonging to either of the Parties, the Subjects shall be set at Liberty & the Effects returned to the Owners; & if any goods belonging to any Nation with whom either of the Parties shall be at war, shall be loaded on Vessels belonging to the other Party, they shall pass free & unmolested without any Attempt being made to take or detain them.—

.4.

A Signal or Pass shall be given to all Vessels belonging to both Parties, by which they are to be known when they meet at Sea, & if the Commander of a Ship of War of either Party, shall have other Ships under his Convoy, the Declaration of the Commander shall alone be sufficient to exempt any of them from examination—³

5

If either of the Parties shall be at War & shall meet a Vessel at Sea belonging to the other, it is agreed that if an examination is to be made, it shall be done by sending a Boat with two or three Men only, & if any Gun shall be fired and any injury done without Reason, the offending Party shall make good all Damages—

.6.

If any Moor shall bring Citizens of the United States or their Effects to His Majesty, the Citizens shall immediately be set at Liberty & the Effects restored & in like Manner, if any Moor not a Subject of these Dominions, shall make Prize of any of the Citizens of America or their Effects, & bring them into any of the Ports of His Majesty, they shall be immediately released as they will then be considered as under His Majesty's Protection.—

.7.

If any Vessel of either Party shall put into a Port of the other & have occasion for Provisions or other Supplies, they shall be furnished without any interruption or molestation—

### .8.

If any Vessels of the United States shall meet with a Disaster at Sea & put into one of our Ports to repair, she shall be at Liberty to land & reload her Cargo without paying any Duty whatever.—

### .9.

If any Vessel of the United States shall be cast on shore on any Part of our Coasts, she shall remain at the Disposition of the owners, & no one shall attempt going near her without their Approbation, as she is then considered particularly under our protection; & if any Vessel of the United States shall be forced to put into our Ports by Stress of Weather or otherwise, she shall not be compelled to land her Cargo, but shall remain in tranquillity untill the Commander shall think proper to proceed on his Voyage—

### .10.

If any Vessel of either of the Parties shall have an engagement with a Vessel belonging to any of the Christian Powers, within Gunshot of the Ports of the other, the Vessel so engaged shall be defended & protected as much as possible untill she is in safety; And if any American Vessel shall be cast on shore on the Coast of Wadnoon[4] or any Coast thereabout, the people belonging to her shall be protected and Assisted untill, by the help of God, they shall be sent to their Country.

### .11.

If we shall be at War with any Christian Power & any of our Vessels sail from the Ports of the United States, no Vessel belonging to the Enemy shall follow untill twenty four hours after the departure of our Vessels, & the same Regulation shall be observed, towards the American Vessels sailing from our Ports. be their Enemies Moors or Christians

### .12.

If any ship of War belonging to the United States shall put into any of our Ports, she shall not be examined on any Pretence whatever, even though she should have fugitive Slaves on Board, nor shall the Governor or Commander of the Place, compel them to be brought on shore, under any Pretext, nor require any payment for them.

### .13.

If a Ship of War of either Party shall put into a Port of the other & salute, it shall be returned from the Fort, with an equal Number of Guns, not with more or less.—

### .14.

The Commerce with the United States shall be on the same footing as is the Commerce with Spain, or as that with the most favored Nation for the time being; & their Citizens shall be respected & esteemed & have full Liberty to pass & repass our Country & Sea Ports, whenever they please without interruption.

### .15.

Merchants of both Countrys shall employ only such interpreters & such other Persons to Assist them in their Business as they shall think proper. No Commander of a Vessel shall transport his Cargo on board another Vessel, he shall not be detained in Port, longer than he may think proper; and all Persons employed in loading or unloading Goods, or in any other Labor whatever, shall be paid at the customary Rates, not more & not Less.

### .16.

In Case of a War between the Parties, the Prisoners are not to be made Slaves, but to be exchanged one for another, Captain for Captain, Officer for Officer and one private Man for another; & if there shall prove a difficiency on either side it shall be made up by the Payment of one hundred Mexican Dollars for each Person wanting. And it is agreed that all Prisoners

10/19/21, 1:51 PM
Case 1:21-cv-11668-IT   Document 6-1   Filed 10/25/21   Page 3 of 7
The Moroccan-American Treaty of Peace and Friendship, [28 June …

shall be exchanged in twelve Months from the time of their being taken, & that this Exchange may be effected by a Merchant, or any other Person authorized by either of the Parties.

.17.

Merchants shall not be compelled to buy or sell any kind of Goods, but such as they shall think proper, & may buy & Sell all sorts of Merchandise, but such as are prohibited to the other Christian Nations—

.18.

All Goods shall be weigh'd & examined, before they are sent on board; & to avoid all detention of Vessels no examination shall afterwards be made, unless it shall be first proved, that contraband Goods have been sent on board; in which Case the Persons who took the contraband Goods on board shall be punished according to the Usage & Custom of the Country & no other Person whatever shall be injured, nor shall the Ship or Cargo incur any Penalty or damage whatever.—

.19.

No Vessel shall be detained in Port on any pretence whatever, nor be obliged to take on board any Article without the Consent of the Commander, who shall be at full Liberty to agree for the freight of any Goods he takes on board—

.20.

If any of the Citizens of the United States or any Persons under their Protection, shall have any Disputes with each other, the Consul shall decide between the Parties, & whenever the Consul shall require any aid or Assistance from our Government to enforce his Decisions, it shall be immediately granted to him.—

.21.

If a Citizen of the United States shall kill or wound a Moor, or on the contrary if a Moor shall kill or wound a Citizen of the United States, the Law of the Country shall take place & equal Justice Shall be rendered the Consul assisting at the Tryal; & if any Delinquent shall make his escape, the Consul shall not be answerable for him in any Manner whatever—

.22.

If an American Citizen shall die in our Country and no Will shall appear, the Consul shall take Possession of his Effects, & if there shall be no Consul, the Effects shall be deposited in the hands of some Person worthy of Trust, untill the Party shall appear who has a right to demand them; But if the Heir to the Person deceased be present, the property shall be delivered to him without interruption, & if a Will shall appear, the Property shall descend agreable to that Will, as soon as the Consul shall declare the validity thereof.

.23.

The Consuls of the United States of America, shall reside in any sea Port of our Dominions that they shall think proper; & they shall be respected & enjoy all the Privileges which the Consuls of any other Nation enjoy; & if any of the Citizens of the United States shall contract any Debts or engagements, the Consul shall not be in any manner accountable for them, unless he shall have given a promise in writing for the payment or fulfilling thereof, without which promise in writing no application to him for any redress shall be made.—

.24.

If any differences shall arrise by either Party infringing on any of the Articles of this Treaty, Peace and Harmony shall remain notwithstanding in the fullest force, untill a friendly Application shall be made for an Arrangement, & untill that Application shall be rejected, no Appeal shall be made to Arms; & if a War shall break out between the Parties, Nine Months shall be granted to all the Subjects of both Parties to dispose of their Effects & retire with their Property; And it is further declared, that whatever indulgences in Trade or otherwise shall be granted to any of the Christian Powers, the Citizens of the United States shall be equally entitled to them.

Case 1:21-cv-11668-IT   Document 6-1   Filed 10/25/21   Page 4 of 7

10/19/21, 1:51 PM                    The Moroccan-American Treaty of Peace and Friendship, [28 June ...

.25.

This Treaty shall continue in full force with the Help of God, for fifty Years—[5]

We have delivered this Book into the Hands of the beforementioned Thomas Barclay, on the first day of the blessed Month of Ramadan in the Year One thousand two hundred.—

I Certify that the annexed is a true copy of the Translation made by Isaac Cardoza Nuñez, Interpreter at Morocco, of the Treaty between the Emperor of Morocco and the United States of America.—

Tho$^s$ Barclay[6]

### Translation of the additional Article

Grace to the only God.

I the underwritten, the Servant of God, Taher Ben Abdelkack Fennish, do certify that His Imperial Majesty my Master (whom God preserve) having concluded a Treaty of Peace and Commerce with the United States of America has ordered me the better to compleat it and in addition of the tenth Article of said Treaty to declare, "that if any Vessel belonging to the United States shall be in any of the Ports of His Majesty's Dominions or within Gunshot of his Forts, she shall be protected as much as possible and no Vessel whatever, belong either to Moorish or Christian Powers with whom the United States may be at War, shall be permitted to follow or engage her, as we deem the Citizens of America our good Friends.["]

And in obedience to his Majesty's Commands I certify this Declaration by putting my hand and Seal to it, on the Eighteenth Day of Ramadan in the Year One thousand two hundred—[7]

(signed)
The Servant of the King my Master whom God preserve
Taher Ben Abdelhack Fennish.[8]

~~I Certify that the Above is a True Copy of the Translation Made at Morocco by Isaac Cardoza Nunes Interpreter of a~~ Declaration Made and signed by Sidi Hage Tahar Fennish in Addition to the Treaty between the Emperor of Morocco and the United States of America which Declaration the said Tahar Fennish Made by the Express Directions of His Majesty—

Tho$^s$ Barclay

Note, The Ramadan of the Year of Hegira 1200 Commenced on the 28th of June in the Year of our Lord 1786—[9]

---

MS (Adams Papers); endorsed by JA: "Treaty with Morocco." Filmed at [15 July 1786]. This copy, signed by Thomas Barclay and containing text in his hand (see notes 6 and 9), is likely one of the three translations that Barclay enclosed with his 2 Oct. letter to the commissioners, below. For a facsimile of the Arabic text, see Miller, Treaties, 2:186–211.

1. This date is derived from that on which Thomas Barclay signed the main body of the treaty on the first day of Ramadan in the year 1200.

The Moroccan-American treaty was negotiated very expeditiously. In part this was because the commissioners' agent, Thomas Barclay, wasted no time in opening the negotiations, but it also reflected the desire of the Moroccan emperor, Mohammad III, for an agreement with the United States. The emperor had opened Moroccan ports to American ships in 1777 and since 1778 had been seeking a treaty. His frustration at failing to receive any response from the United States to his overtures led him to seize the brig Betsy in Oct. 1784, and it is from that capture, and others by Algiers, that Congress' decision to negotiate with Morocco and the other Barbary States largely proceeded (vols. 6:32–33; 14:501–502; 16:xv–xvi, 491). Barclay reached Marrakesh, the site of the Moroccan court, on 19 June 1786, and after two audiences with the emperor and the submission of the heads of the articles proposed for the treaty, Morocco approved the agreement on 23 June, and Barclay signed it on the 28th.

The agreement is based on the draft treaty with the Barbary States that Benjamin Franklin and Thomas Jefferson prepared in mid-1785 (Jefferson, Papers, 8:347–354). JA received a copy of the draft for his comments as an enclosure with Jefferson's 6 Aug. letter (vol. 17:306–308). The only changes suggested by JA related to Art. 17 of the draft (Art. 14 of the final treaty), concerning the application of the most favored

nation principle (vol. 17:341–342). After receiving JA's comments, Jefferson presumably prepared fair copies of the draft for Barclay and John Lamb to carry on their missions to Morocco and Algiers, respectively. Neither has been found, however, so comparisons between the draft and the final treaty are based on the draft as printed in Jefferson, Papers.

To save time and avoid modeling the treaty on the 1780 Spanish-Moroccan Convention of Amity and Commerce, Barclay proposed to submit to the emperor "the Heads of such a Treaty as I imagined would be perfectly agreeable to both Countries" (Barclay to the commissioners, 18 Sept. 1786, below). Barclay presumably meant that he would condense the articles in the draft to their essentials, and the treaty articles are, for the most part, shorter than those in the draft. It should be noted that Barclay's "Heads" were translated from English into Arabic and then back into English; see the comments on problems with the English translation in Miller, Treaties, 2:220–223. It was the English translation provided by Barclay, however, that was ratified by Congress and that served as the definitive text for American purposes.

The most striking differences between the draft and the treaty are the omission of the draft's preamble and Arts. 1 through 3. To a degree the draft's preamble and Art. 1 were combined into the treaty's preamble and Art. 1. But Arts. 2 and 3, the first of which provided for the release of any American citizens in captivity —of which there were none since the release of the Betsy, for which see vol. 17:277—and the second providing that no Moroccan ships would take prizes or cruise within sight of the American coast, were probably considered irrelevant. So, too, presumably was Art. 8 of the draft, concerning the liability of commanders of public and private ships and the bond provided upon the commissioning of a privateer, and Art. 28, concerning the granting of particular commercial advantages to other nations.

The Moroccan additions to the treaty are also significant. The new preamble and Art. 1 were routine, presumably intended to bring the treaty into conformity with the style of other Moroccan treaties, and throughout the treaty it is made clear that Morocco, a Muslim state, was concluding a treaty with a Christian state. But the most significant Moroccan addition was Art. 16, for in declaring that prisoners of war would not be made slaves and setting the conditions for their exchange, it resolved, at least in the case of Morocco, the principal reason for the United States to negotiate treaties with the Barbary States. Finally, the additional article was essentially the inclusion of language to make Art. 10 reciprocal with regard to the provisions in Art. 11 applying to Morocco.

Barclay did not leave the Moroccan court until mid-July. The delay was caused by the need to add the addition to and clarification of Art. 10, but apparently it was also due to translation problems and unauthorized changes to the treaty, for which see Barclay's 16 July letter, below. In any event, it was not until his 2 Oct. letter, below, following a lengthy journey through Morocco on his way to Spain, that Barclay dispatched Lt. Col. David Salisbury Franks to Paris with the treaty and its supporting documents. Franks reached Paris in late December, at which time Jefferson prepared a document indicating the commissioners' provisional ratification of the treaty (see at 25 Jan. 1787, below), which he signed on 1 Jan., with JA doing so on the 25th. The commissioners then sent the treaty to America under cover of their 27 Jan. letter to John Jay, below, and Congress ratified it on 18 July (JCC, 32:355–364).

2. That is, 22 or 23 June 1786.

3. For the ship signals agreement signed on 6 July, the 9th day of Ramadan in the year 1200, see Miller, Treaties, 2:219.

4. That is, the western coast of Morocco, where the Sahara Desert meets the Atlantic Ocean.

5. This was an extraordinary period of time because the commissioners' 7 May 1784 instructions had set the maximum duration for a treaty with a European power at ten years. However, the same instructions stated that with regard to treaties with the Barbary States, they should "continue for the same Term of 10 years or for a Term as much longer as can be procured" (vol. 16:195, 196).

6. In Barclay's hand.

7. That is, 15 July 1786.

Case 1:21-cv-11668-IT   Document 6-1   Filed 10/25/21   Page 6 of 7

10/19/21, 1:51 PM                            The Moroccan-American Treaty of Peace and Friendship, [28 June ...

8. In addition to the emperor's desire for a treaty, the speed with which the agreement was concluded may have owed much to the experience at European courts of the emperor's representative in the negotiations, Sidi Haj Tahar Ben Abdulhaq Fennish. He was a seasoned European diplomat who had served as Moroccan ambassador to Britain in 1774 and would later serve as its ambassador to the Ottoman Empire (*Repertorium*, 3:241, 242).

9. The final paragraph, signature, and note are in Barclay's hand.

---

*Note:* The annotations to this document, and any other modern editorial content, are copyright © The Massachusetts Historical Society. All rights reserved.

Back to top

| | |
|---|---|
| SOURCE PROJECT | Adams Papers |
| TITLE | The Moroccan-American Treaty of Peace and Friendship, [28 June 1786] |
| AUTHOR | Adams, John |
| DATE | 28 June 1786 |
| CITE AS | "The Moroccan-American Treaty of Peace and Friendship, [28 June 1786]," *Founders Online,* National Archives, https://founders.archives.gov/documents/Adams/06-18-02-0196. [Original source: *The Adams Papers*, Papers of John Adams, vol. 18, *December 1785–January 1787*, ed. Gregg L. Lint, Sara Martin, C. James Taylor, Sara Georgini, Hobson Woodward, Sara B. Sikes, Amanda M. Norton. Cambridge, MA: Harvard University Press, 2016, pp. 360–367.] |

---

The National Historical Publications and Records Commission (NHPRC) is part of the National Archives. Through its grants program, the NHPRC supports a wide range of activities to preserve, publish, and encourage the use of documentary sources, relating to the history of the United States, and research and development projects to bring historical records to the public.

---

Founders Online is an official website of the U.S. government, administered by the National Archives and Records Administration through the NHPRC, in partnership with the University of Virginia Press, which is hosting this website.

 An official website of the United States government
Here's how you know

 THE UNITED STATES DEPARTMENT OF JUSTICE ARCHIVES

This is archived content from the U.S. Department of Justice website. The information here may be outdated and links may no longer function. Please contact webmaster@usdoj.gov if you have any questions about the archive site.

## 1508. SPECIFICALLY MENTIONED IDENTIFICATION DOCUMENTS -- 18 U.S.C. 1028

Section 1028 of Title 18 designates three special non-federal identification documents and gives them preferred treatment. These three documents, in the absence of a national identity card, are the prime means by which an individual establishes his identity in the United States. The three documents are: (A) birth certificate; (B) driver's license; and (C) personal identification card.

- A. "Birth Certificate" is not defined in 18 U.S.C. § 1028 since it is self-explanatory. This document is issued by different agencies in different states and foreign countries. Nevertheless, it represents the official governmental statement by the proper government agency that a person having such a name was born on a particular date in a particular place of specific parentage. Obviously, a birth certificate is not intended to actually identify the person who claims such a document pertains to him. There are few physical characteristics that remain the same as those at the time of birth. Nevertheless, the birth certificate has become "commonly accepted" as an identification document in this country.
- B. "Driver's License" is not defined in 18 U.S.C. § 1028. The original purpose of this government issued document was to state that a particular person was authorized to operate a vehicle upon the public roadways. It was not intended to establish one's identity. Because of the absence of a better document, however, the driver's license eventually has become "commonly accepted" as the "national identity card." Section 1028 covers both domestic as well as foreign government issued driver's licenses.
- C. "Personal Identification Card" is defined in 18 U.S.C. § 1028(d)(4) to mean "an identification document issued by a State or local government solely for the purpose of identification . . . ." This definition would appear to limit such documents to those issued by domestic (i.e., within the United States) governmental entities in contrast to the first two (birth certificates and driver's licenses). This document is normally issued by state departments of motor vehicles to provide an identification document for those persons who do not for some reason obtain a driver's license. In 1979, the National Committee on Uniform Traffic Laws and Ordinances, authors of the Uniform Vehicle Code (UVC), provided for the issuance of identification cards for non-drivers and restrictions on the unlawful use of such cards. The UVC, which serves as the model state code for vehicular matters, defines a "personal identification card" as "a document issued by the department [of motor vehicles] for the sole purpose of identifying the bearer and not authorized for use as a driver's license." UVC § 1-156 (1987).

[cited in JM 9-64.400]

‹ 1507. Types Of Identification Documents -- 18 U.S.C. 1028    up    1509. Operative Terms -- 18 U.S.C. 1028 ›

*Updated January 17, 2020*